1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Tucson Herpetological Society, et al.,   )   No. 04-CV-00075-PHX-NVW
                                             )
10              Plaintiffs,                   )   **ORDER**
                                             )
11  vs.                                       )
                                             )
12                                            )
    Dirk Kempthorne, et al.,                  )
13                                            )
                Defendants.                   )
14                                            )
                                             )
15  _____)

16        The court has before it Plaintiffs' Motion for Summary Judgment (doc. # 109) and

17  supporting Memorandum (doc. # 110); Defendants' Cross-Motion for Summary Judgment

18  (doc. # 113) and supporting Memorandum (doc. # 114); and Plaintiffs' Reply (doc. # 115).

19        This is the continuation of a long-running dispute about the listing of the flat-tailed

20  horned lizard (*Phrynosoma mcallii*) ("FTHL" or "lizard") under the Endangered Species Act

21  of 1973 ("ESA" or "Act"), 16 U.S.C. §§ 1531 *et seq*.  The Secretary of the Interior (the

22  "Secretary"), acting through the Fish and Wildlife Service[1] ("FWS"), proposed listing the

23  species for protection in 1993.  58 Fed. Reg. 62624 (noting documented and anticipated

24  population declines associated with widespread habitat loss, fragmentation, and degradation

25  due to human activities such as agricultural development, urban expansion, off-highway

26  _____

27        [1]The Fish and Wildlife Service administers the ESA with respect to species under the
    jurisdiction of the Secretary of the Interior, including the flat-tailed horned lizard. 50 C.F.R.
28  § 402.01(b).

vehicle ("OHV") use, energy developments, and military activities).  The Secretary moved to withdraw that proposal in 1997, 62 Fed. Reg. 37852, and again in 2003, citing a changed interpretation of current and anticipated threats to extant lizard populations.  68 Fed. Reg. 331, 335/1, 348/3 (January 3, 2003) ("2003 Finding").  The Tucson Herpetological Society, other environmental groups, and concerned individuals ("Plaintiffs") turned back the withdrawal notices on the ground that the Secretary failed to consider whether the flat-tailed horned lizard was "in danger of extinction throughout . . . a significant portion of its range." 16 U.S.C. § 1532(6); *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145-46 (9th Cir. 2001) (vacating 1997 withdrawal); (doc. # 59 at 8-11) (vacating 2003 withdrawal for failure to comply with *Defenders*).

On remand, the Secretary reopened the comment period and conducted an analysis of both the size and the significance of "the lost historical habitat of the flat-tailed horned lizard."  71 Fed. Reg. 367545, 36745/2 (June 28, 2006) ("2006 Finding").[2]  After further study, the Secretary once again resolved to withdraw the proposed listing.  *Id*. (concluding that the lost habitat is "not a significant portion" of the lizard's range and "does not result in the species likely becoming endangered in the foreseeable future throughout all or a significant portion of its range").  Plaintiffs oppose that conclusion.  The narrow question presented by Plaintiffs' Supplemental Complaint (doc. # 98) is whether the Secretary's interpretation of the phrase, "in danger of extinction throughout . . . a significant portion of its range," 16 U.S.C. § 1532(6), is consistent with the decision of the Court of Appeals for the Ninth Circuit in *Defenders*, and supported by the administrative record.  5 U.S.C. § 706(2)(A).  The court finds that it is for the reasons set forth below.

/ / /

---

[2]The administrative record in this matter is composed of the record for the 2003 Finding (doc. # 40) (hereinafter "AR"), and the supplemental record for the 2006 Finding (doc. # 112) (hereinafter "Supp. AR").

1

2 **I.      Background**

3          **A.      The Flat-Tailed Horned Lizard**

4          The flat-tailed horned lizard is a small iguanid with a long, flattened body, a broad

5  flattened tail, and dagger-like head spines. 68 Fed. Reg. at 331/3.  The lizard ranges in color

6  from pale gray to light rust brown dorsally, and white or cream ventrally, and is distinguished

7  by a dark vertebral stripe and two rows of fringed scales on either side of its body.  *Id*.  The

8  lizard most commonly inhabits sandy flats and valleys with creosote and white bursage

9  plants, which are generally found on alluvial fans and upland slopes with well-drained soils.

10  71 Fed. Reg. at 36745/3; (Supp. AR doc. # 327 at 2991).  Behaviorally, the FTHL differs

11  from other iguanids in that it remains still or may bury itself in loose sand when approached.

12  This reluctance to move when disturbed, together with cryptic coloration and flattening of

13  the body, makes the lizard difficult to locate and study in its desert habitat.  (Supp. AR doc.

14  ## 329 at 3012 (citations omitted); 325 at 2894.)

15          **B.      The Range of the Flat-Tailed Horned Lizard, Current and Historic**

16          The flat-tailed horned lizard "has the most limited distribution of any horned lizard

17  species" in the United States, occurring "entirely within the Lower Colorado River Valley

18  Subdivision of the Sonoran Desert Scrub, the largest and most arid subdivision of the

19  Sonoran Desert."  (Supp. AR doc. # 329 at 3005, 3009.)  The species' historic range

20  encompasses the extreme southwestern corner of Arizona, the southeastern corner of

21  California, and adjoining portions of Sonora and Baja California, Mexico.  (*Id*. at 2999.) The

22  2003 Rangewide Management Strategy ("RMS")[3], published by the FTHL Interagency

23

24          [3] The Rangewide Management Strategy provides a "framework for conserving

25  sufficient habitat to maintain several viable populations of the [FTHL] throughout the range
   of the species in the United States."  68 Fed. Reg. at 334/1 (identifying five Management

26  Areas located on federal land in California and Arizona pursuant to the 1997 Conservation
   Agreement, discussed in *Defenders*, 258 F.3d at 1139-40).  FTHL habitat located outside of

27  the Management Areas receives "a degree of protection" through mitigation, compensation,

28  and monitoring efforts.  (Supp. AR. doc. # 329 at 3028.)

1   Coordinating Committee and incorporated by reference in the 2006 Finding, contains a
2   graphic representation of the lizard's historic range and its smaller and more fragmented
3   current range, both within the United States and south of the international border in Mexico.
4   71 Fed. Reg. at 36746/2; (Supp. AR doc. # 329 at 3008).  The Secretary's analysis of the lost
5   historic range in the 2006 Finding builds upon his prior assessment of the distribution, and
6   threats to, the FTHL on its current range.  71 Fed. Reg. at 36745/2 (incorporating the 2003
7   current range analysis, which was previously upheld on judicial review, in the 2006 Finding).
8   The relevant portions of the 2003 and 2006 Findings are summarized below.

9                   **1.      The 2003 Finding: Analysis of the Current Range**

10                  **i.      Distribution of the Lizard Today**

11          In the 2003 Finding, the Secretary found that the "distribution of the flat-tailed horned
12  lizard is not contiguous across its range," but is rather fragmented by "large-scale agriculture
13  and urban development" and natural geographic barriers such as the Colorado River and the
14  Salton Sea.  68 Fed. Reg. at 332/1; (Supp. AR doc. ## 330 at 3114 (observing that the FTHL
15  occupies "a specific microhabitat that is now patchily distributed" throughout its historic
16  range in California, Arizona, and Mexico); 329 at 3008 (visual depiction of FTHL habitat
17  fragmentation)).

18          In the United States, surviving lizard populations are concentrated within four
19  "geographically discrete populations" on approximately 1,376,525 acres of historic habitat.
20  68 Fed. Reg. at 332/1-2.  In California, the lizard is found in the Coachella Valley, the west
21  side of the Salton Sea and Imperial Valley (Borrego Valley, Ocotillo Wells area, West Mesa,
22  and the Yuha Desert), and the east side of the Imperial Valley (East Mesa, Algodones Dunes,
23  and the Dos Palmas Bureau of Land Management area).  *Id*. at 331/3, 332/1.  Arizona
24  populations of the FTHL are located in the Yuma Desert south of the Gila River and west of
25  the Gila and Butler Mountains.  *Id*. at 332/1.

26          In Mexico, the lizard may be found south of California's Yuha Desert from the
27  international border to the Laguna Salada in Baja California, and south of Arizona's Yuma
28  Desert to the Pinacate Region and the sandy plains around Puerto Peñasco and Bahia de San

1    Jorge, Sonora. *Id*. at 332/1. The precise number of acres occupied by the lizard in Mexico

2    is unknown. In fact, "the distribution of the species in Mexico is poorly understood because

3    few surveys have been conducted" there. *Id*. at 332/2. Like those in the United States,

4    however, Mexican lizard populations have been isolated to some degree by human-mediated

5    processes, particularly agricultural and urban development. *Id*. at 332/2, 345/2-3.

6                         **ii.      Documented and Anticipated Threats**

7            After delineating the lizard's current range, the Secretary evaluated the documented

8    and anticipated threats to the species in light of the five listing factors prescribed by the

9    ESA.[4] The Secretary observed, "The increased use of the desert by Border Patrol, OHVs,

10   and other development and the resulting effects on flat-tailed horned lizards has been difficult

11   to monitor." *Id*. at 339/3. "Intuitively," the Secretary "know[s] these impacts cannot keep

12   increasing without resulting in negative impacts to habitat." *Id*. at 339/3. "However, based

13   on the best available information," the Secretary "determined that such possible negative

14   impacts do not currently, or in the foreseeable future, pose a threat to the species." *Id*. at

15   339/3, 341-47 (applying the five statutory listing factors to lizard populations on public and

16   private lands). The Secretary withdrew his proposal to list the flat-tailed horned lizard under

17   the ESA upon concluding that "the threats to the species . . . are not as significant as earlier

18   believed." *Id*. at 348/3.

19                        **iii.     Current Range Analysis Upheld in Full**

20           On judicial review of the 2003 Finding, this court upheld the Secretary's site-specific

21   review of threats to existing lizard populations on the current range in full. (Doc. # 59 at 11-

22   15 (accepting the Secretary's "fact-based examination of the significance of the threats posed

23   to part of the species' range to the viability of the species as a whole," which was based on

24   _____

25           [4] The five factors the Secretary must consider when determining a species' eligibility
     for protection are: (A) the present or threatened destruction, modification, or curtailment of

26   [the species'] range; (B); overutilization for commercial, recreational, scientific, or
     educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory

27   mechanisms; (E) other natural or manmade factors affecting [the species'] continued

28   existence. 16 U.S.C. § 1533(a)(1).

1   "the best scientific and commercial data available").) The Secretary's application of the five

2   listing factors to extant lizard populations will be not be disturbed here.

3                           **iv.    Historic Range Analysis: The Fatal Flaw in the 2003 Finding**

4           Though his discussion of the threats to the lizard on its current, fragmented range

5   passed muster, the Secretary violated the command of the Ninth Circuit by failing to identify

6   and assess the significance of the historic habitat no longer available to the species. (Doc.

7   # 59 at 9-11.) *Defenders* held, in essence, that the Secretary must define the ambiguous term,

8   "a significant portion of its range," apply that definition to the lost historic range, and explain

9   his conclusions as to the significance of the forsaken habitat. 258 F.3d at 1145. The 2003

10  Finding was deficient because, after noting that entire portions of the lizard's historic range

11  in the United States and Mexico had been lost, 68 Fed. Reg. at 332/2, the Secretary did not

12  go on to evaluate the impact of that lost range upon the species, or make any findings as to

13  the significance of that lost habitat whatsoever. He did not consider, for example, whether

14  there were any attributes or specific uses of the lost habitat that made it significant to the

15  survival of the species in any particular geographic area, or even whether the species could

16  recover to the point where it can re-colonize some of its lost habitat. Instead, the Secretary

17  conducted a "forward-looking analysis" that focused exclusively upon the impact of human

18  activity upon the survival of the species as a whole on its current range. (Doc. # 59 at 9)

19          The Secretary necessarily has a "wide degree of discretion in delineating 'a significant

20  portion of its range,' since the term is not defined in the statute." *Defenders*, 258 F.3d at

21  1145. However, the Secretary may not close his eyes to the possibility that the lost habitat

22  constitutes a "significant portion" of the species' total range. The Secretary may not assume,

23  without more, that the viability of the species in some specified portion of its current range

24  renders other geographically distinct portions of the historic range insignificant. The

25  Secretary construed the phrase, "in danger of extinction throughout . . . a significant portion

26  of its range," 16 U.S.C. § 1532(6), to mean "that a species is eligible for protection under the

27  ESA if it faces threats in enough key areas of its range that the *entire species* is in danger of

28  extinction, or will be in the foreseeable future." *Defenders*, 258 F.3d at 1141 (emphasis in

1   original).  This interpretation was "unacceptable" because it could "not be squared with the

2   statute's language or structure."  *Id.* at 1141.  To posit "that a species in danger of extinction

3   in a 'significant portion of its range' only if it is in danger of extinction everywhere" is to

4   render the phrase "superfluous."    *Id.* at 1141-42.  The Secretary may not exercise his

5   discretion under the Endangered Species Act to write the phrase, "a significant portion of its

6   range" out of the statute entirely.  16 U.S.C. § 1532(6).

7        The Secretary's failure to define the lizard's range so as to include some lost habitat,

8   and his failure to determine whether that lost habitat constituted a "significant portion of its

9   range," was fatal to the 2003 rulemaking.  (Doc. # 59 at 10); *see Defenders*, 258 F.3d at

10  1145, 1154 n.11 (deference not warranted because the court cannot "defer to what [it] cannot

11  perceive") (citation and internal quotations omitted).  Other courts have relied on *Defenders*

12  to vacate listing decisions on substantially the same grounds.  *See Defenders of Wildlife v.*

13  *Norton*, 239 F. Supp. 2d 9, 20, 20 n.7 (D.D.C. 2002) (Faulting the Secretary for adopting a

14  "crabbed interpretation of the phrase 'significant portion of its range,' which would mean

15  that a species that had once survived in a region, but no longer did, was not entitled to the

16  protections of the ESA," and vacating the rulemaking for failure to explain why the area in

17  which the Canada Lynx can no longer live is not a significant portion of its range.);

18  *Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1167-69 (D.

19  Or. 2005) (Vacating Gray Wolf rulemaking because the Secretary applied the ESA's five

20  listing factors  to the species on its current range without considering or explaining the

21  significance of the wolf's lost historic range); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp.

22  2d 553, 564-566 (D. Vt. 2005) (vacating a different Gray Wolf listing decision on similar

23  grounds).

24       This court's narrow remand order instructed the Secretary to identify an appropriate

25  "temporal baseline" for the FTHL, and to consider "whether the lizard's lost historical habitat

26  renders the species in danger of extinction in a significant portion of its range."  (Doc. ## 59

27  at 10; 68 at 2.)  The Secretary published the June 26, 2006 notice of withdrawal in response

28  to this court's Order.  71 Fed. Reg. at 36745. The 2006 Finding is fully consistent with

1   *Defenders*, as discussed in further detail below.

2       **2.      The 2006 Finding: Historic Range Analysis**

3         In the 2006 Finding, the Secretary defined the lizard's range so as to include lost

4   habitat, estimated the extent of habitat loss, and then determined whether that lost habitat

5   constitutes a "significant portion" of the FTHL's historic range.  The Secretary found that

6   approximately 1,103,201 acres of the lizard's estimated 4,875,624 acre historic range in the

7   United States and Mexico have been permanently lost human-mediated processes.  *Id*. at

8   36749/3, 36751/1-2.  The habitat loss began in the early 20th century, when agricultural and

9   urban development started to encroach upon the lizard's habitat in the southwestern United

10  States and northwestern Mexico.  71 Fed. Reg. at 36751/1.

11        At the heart of the 2006 Finding is the Secretary's conclusion that the forsaken

12  historical habitat is not biologically, geographically or otherwise significant to the flat-tailed

13  horned lizard.   The Secretary found that the approximately 1,103,201 acres lost to

14  agriculture, urbanization and other human-mediated processes is not a significant portion of

15  the lizard's range because 1) the species has persisted despite without that portion of its

16  range; 2) the lost habitat has not caused, and does not threaten to cause, lizard populations

17  to decline throughout the species' current range in the foreseeable future; and 3) there were

18  no particular attributes of the lost habitat that made it any more significant than any other part

19  of the range.   *Id*.   These conclusions find ample, if not unanimous, support in the

20  administrative record, and are otherwise reasonable.  The Tucson Herpetological Society and

21  its co-Plaintiffs believe otherwise, noting that there are major geographical areas in which

22  the lizard is no longer viable but once was, and faulting the Secretary for not ascribing to the

23  lost acreage the importance it deserves.  The parties support their respective positions by

24  reference to *Defenders*, the controlling decision in this matter.  It is to that decision that the

25  court now turns.

26

27

28

### C.    The *Defenders* Decision

#### 1.    The Statutory Puzzle

Under the ESA, a species is "endangered" if "it is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).[5] Thus, listing is required if a species is "in danger of extinction throughout all . . . of its range," or if it is "in danger of extinction throughout  . . . a significant portion of its range." 16 U.S.C. § 1532(6). The parties agree that the FTHL is not in danger of extinction, or likely to become in danger of extinction in the foreseeable future, throughout *all* of its range. Instead, the parties dispute whether the species qualifies for ESA protection on the basis of threats to its survival on a "significant portion" of its range, the second of the two disjunctive listing criteria. Though it is central to the definition of both "endangered species" and "threatened species," the Act provides little guidance as to what constitutes "a significant portion" of a species' range. The 1993 proposal to list the flat-tailed horned lizard, 58 Fed. Reg. 62624, and the subsequent withdrawal of that proposal in 1997, 62 Fed. Reg. 37852, presented the Court of Appeals for the Ninth Circuit with an opportunity to "puzzl[e] out the meaning of the phrase." *Defenders*, 258 F.3d at 1141.

#### 2.    The *Defenders* Analysis

In *Defenders*, the Court of Appeals for the Ninth Circuit observed that the dictionary definition of the word "extinct," meaning "has died out or come to an end . . . [h]aving no living representative," is at odds with the more "flexible" definition of "extinct" contemplated by the ESA. 258 F.3d at 1141, 1146. The Act is drafted to prevent species from becoming "extinc[t] throughout . . . a significant portion of its range." 16 U.S.C. § 1532(6). This is "odd phraseology" because, at least in "ordinary usage," a species has not "come to an end" when some individuals are persisting elsewhere. 258 F.3d at 1141. It is also  "internally inconsistent," observed the court, "to speak of a species that is 'in danger

---

[5] A "threatened species" is one that is "likely to become . . . endangered . . . within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

1  of extinction' throughout a 'significant portion of its range[,]' . . . since 'extinction' suggests

2  total rather than partial disappearance." *Id*.  After surveying the applicable legislative

3  history, the court resolved the textual ambiguity by concluding that a species need not be

4  threatened with "worldwide extinction" to qualify for protection under the Endangered

5  Species Act. *Id*. at 1144.

6       Congress added the "significant portion of its range" language to 16 U.S.C. § 1532(6)

7  to "allow the Secretary more flexibility in [his] approach to wildlife management," the court

8  explained.  *Id*. at 1144.  To that end, the definition of "endangered species" allows the

9  Secretary in his discretion to list a species that is threatened in a "significant portion" of its

10 range even if the same species is thriving in other geographic areas. *Id*. at 1144-45.  The

11 Secretary need not formally divide the species into Distinct Population Segments ("DPSs")

12 to accomplish a geographically tailored listing, since the authority is apparent on the face of

13 the statute itself.[6]  Conversely, 16 U.S.C. § 1532(6) allows the Secretary to forego listing

14 altogether where the species is experiencing healthy population levels on the "significant

15 portions" of its range, but is in danger of extinction (or already extinct) in areas considered

16 by the Secretary to be of no significance.  In that case, the individual States, as opposed to

17

18 _____

19       [6] The FTHL currently exists in "geographically discrete populations" patchily

20 distributed throughout its historic range in the United States and Mexico.  68 Fed. Reg. at
   332/1-2.  Despite this habitat fragmentation, the FTHL has not been subdivided into distinct

21 population segments under the FWS policy on the recognition of "discrete" and "significant"
   populations.  *Id*. at 331, 336/3; 61 Fed. Reg. 4722, 4725 (DPS Policy).  Therefore, the lizard

22 could, but need not, be listed throughout all of its range if the Secretary were to conclude,
   contrary to the facts of this case, that the lizard is "endangered" or "threatened" throughout

23 a "significant portion" of its range.  *See* Edward A. Fitzgerald, *Dysfunctional Downlisting

24 Defeated: Defenders of Wildlife v. Secretary, U.S. Department of the Interior*, 34 B.C. Envtl.
   Aff. L. Rev. 37, 65-78 (2007) (analyzing the origins of the DPS policy and FWS' application

25 of that policy in the case of the gray wolf); *see also Nat'l Ass'n of Home Builders v. Norton*,

26 340 F.3d 835, 848 (9th Cir. 2003) (reviewing DPS as applied to the cactus ferruginous
   pygmy-owl in Arizona, and distinguishing the word "significant" in the DPS policy from the

27 word "significant" in the phrase, "a significant portion of its range," 16 U.S.C. § 1532(6)).

28

1   the federal government, would have full authority to use their management skills to insure

2   the proper conservation of the species. *Id*. at 1144.

3          When making his listing decision, the Secretary must always consider whether the loss

4   of some of the species' historic range qualifies the species for ESA protection. "[A] species

5   may be extinct 'throughout . . . a significant portion of its range' if there are major

6   geographical areas in which it is no longer viable but once was," the court concluded. *Id*.

7   at 1145 (citing rulemakings in which the Secretary expressly considered whether a species

8   qualified for listing in major geographical areas that were separated from other portions of

9   its historic range by political boundaries, natural geographical features, agricultural or urban

10  development, or DPS classification). If the Secretary finds in his discretion that the lost

11  habitat is of no significance, then he "must at least explain [his] conclusion that the area in

12  which the species can no longer live is not a 'significant portion of its range.'" *Id*. at 1145.

13  Such explanation is particularly important "where, as here, it is on the record apparent that

14  the area in which the lizard is expected to survive is much smaller than its historical range."

15  *Id*. at 1145.

16         The *Defenders* court found a middle ground between the Secretary's construction of

17  16 U.S.C. § 1532(6), which viewed the statute as "saying the same thing twice," and

18  Defenders' rigid, quantitative interpretation of the phrase, "a significant portion of its range."

19  *Id*. at 1142-43. This "case by case" approach is faithful to the intent of Congress because it

20  gives substantive meaning to each component of the defined terms, "endangered species,"

21  and "threatened species," and requires the Secretary to consider every factor that may

22  militate in favor of listing a species, including the loss of "significant portions" of historic

23  range. *Id*. at 1143. Because the loss of even a very small percentage of "significant" habitat

24  triggers mandatory listing, the Secretary must explain his assessment of the lost historic

25  range if his rulemaking is to survive judicial review.

26  **II.     Standard of Review**

27         Section 706 of the Administrative Procedure Act ("APA") governs this court's review

28  of agency action under the EPA. *Nat'l Ass'n of Home Builders*, 340 F.3d at 840-41. Under

the APA, the reviewing court must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is "arbitrary and capricious" if it

> relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*O'Keeffe's v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

The arbitrary and capricious standard is a "narrow one," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971), and judicial review, even in the summary judgment phase, is "highly deferential." *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986). The agency must present a "rational connection between the facts found and the conclusions made," and the "reviewing court may not substitute its judgment for that of the agency." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004); *O'Keeffe's*, 92 F.3d at 942 (citation omitted). Where "a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*, 545 U.S. 967, 980 (2005) (citing *Chevron U.S.A., Inc., v. Natural Res. Def. Council*, 467 U.S. 837 (1984)). The "reviewing court should be at its most deferential in reviewing an agency's scientific determinations in an area within the agency's expertise." *Natural Res. Def. Council v. EPA*, 863 F.2d 1420, 1430 (9th Cir. 1988) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983)). The court "presum[es] the agency action to be valid and affirm[s] the agency action if a reasonable basis exists for its decision." *Northwest Ecosystem Alliance v. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation and internal quotations omitted).

If the agency fails to articulate a rational basis for its decision, it is appropriate for a court to remand for reasoned decision-making. *See Defenders*, 254 F.3d at 1145 n.11

1    (Secretary's interpretation of the ambiguous phrase "significant portion of its range" owed

2    no deference under *Chevron* where agency failed to apply that term).  A discretionary agency

3    action may also be remanded for failure to adhere to the "required procedures of

4    decisionmaking" set forth in the Endangered Species Act itself.  *Bennett v. Spear*, 520 U.S.

5    154, 172 (1997).

6    **III.    Plaintiffs' Renewed Challenge**

7            **A.    The Legal Framework**

8            Congress has delegated authority to the Secretary to parse the enigmatic phraseology

9    at the center of this lawsuit, "in danger of extinction throughout . . .  a significant portion of

10   its range."  16 U.S.C. § 1532(6).  Under *Chevron*, the court must defer to the Secretary's

11   construction if he fills the statutory gap in reasonable fashion.  467 U.S. at 865-866.  The

12   Secretary's authority is cabined by the *Defenders* decision, however.  In *Defenders*, the Ninth

13   Circuit held that "a significant portion of its range" has a substantive, historical dimension

14   that the Secretary may not ignore if his rulemaking is to survive judicial review.  The

15   Secretary must study the lost historical habitat and determine whether any portion of that lost

16   range constitutes a "significant portion" of the species' range.  *Defenders*, 258 F.3d at 1145.

17   If he finds in his discretion that the lost habitat is of little or no significance, then the

18   Secretary must "at least explain [his] conclusion that the area in which the species can no

19   longer live is not a significant portion of its range."  *Id.* (internal quotations omitted).  An

20   explanation is required because a species can, but need not, be extinct "throughout . . . a

21   significant portion of its range" "if there are major geographical areas in which it is no longer

22   viable but once was."  *Id.*

23           **B.    The 2006 Finding**

24           The 2006 Finding complies with the ESA, the *Defenders* decision, and this court's

25   remand Order.  The Secretary filled the statutory gap in 16 U.S.C. § 1532(6) by construing

26   the phrase, "a significant portion of its range" so as to encompass biological significance as

27   well as geographical significance.  (Doc. # 114 at 23.)  He then cured the deficiency in the

28   2003 Finding by delineating the lizard's lost historical habitat and evaluating the habitat lost

1   since the early 20th century using the criteria identified by him.  The rulemaking is analyzed
2   in greater detail below.

### 1.    Setting the Temporal Baseline and Delimiting Lost Habitat

4        First, the Secretary chose a point in time at which to examine the lizard's range.  He
5   resolved to study habitat loss occurring over the past 100 years, a time frame that constitutes
6   "the available recorded historical information" in this area.[7]  71 Fed. Reg. at 36749/3.  Over
7   the past century, "[a]pproximately 1,103,201 [acres of historic habitat] have been lost, nearly
8   entirely within . . . the Coachella Valley, and Mexicali and Yuma areas," the Secretary
9   concluded. *Id*. at 36751/1.  In the Mexicali area, agricultural development caused habitat loss
10  extending from Mexicali south to the Gulf of California and east to the Colorado River.
11  "This block of lost habitat is contiguous . . . with the block of lost habitat in the Yuma area,"
12  the Secretary explained. *Id*. at 36751/1.  "The block of habitat that encompasses northeastern
13  Baja California Note and southwestern Arizona is the largest block of lost habitat," he
14  averred.  *Id*. at 36751/1.

### 2.    The Lost Habitat Is Insignificant

16       After setting a temporal baseline and defining the subject area, the Secretary
17  proceeded to evaluate the significance of the lost historical habitat.  He concluded that the
18  Coachella Valley area, including its lost associated habitat, was insignificant because of its
19  small size relative to the overall range of the species, the high level of fragmentation due to
20  human development, the lack of genetic, behavioral, or ecological differentiation, and the
21  small size and importance of the population in general.  *Id*. at 36751/1; 68 Fed. Reg. at 348/1-
22  2 (same in 2003 Finding).  The remaining parcels of lost historical habitat areas near
23  Mexicali and Yuma were also deemed insignificant.  "These habitat areas were likely
24  converted to agriculture early in the 20th century," and are not a significant portion of the
25  lizard's historic range because of their "small size relative to the entire range and because this

---

27  [7] The Secretary consulted his own "knowledge of habitat preference for the species,
    early descriptions of habitat before development, and early museum records" to construct his
28  "estimation of the broad-scale historical range."  71 Fed. Reg. at 36747/1.

1    area has been lost to agriculture for nearly a century and the flat-tailed horned lizard has

2    persisted" in surrounding habitats, such as East and West Mesa, and the Yuha Basin, for

3    generations. 71 Fed. Reg. at 36751/1. The "lost habitat was not significant enough to lead

4    to the species' extirpation within intact habitat through edge effects or fragmentation," the

5    Secretary observed. *Id*. at 36751/2.

6         Not only has the species persisted for nearly a century in the face of the steady habitat

7    destruction, but the size of existing lizard populations has not declined and is not likely to

8    decline in the foreseeable future because of the loss of 1,103,201 acres of historic range, the

9    Secretary found. *Id*. at 36751/2-3. After surveying the "available data concerning population

10   abundance, trends, and threats," the Secretary concluded that yesterday's conversion of

11   suitable habitat to agriculture in the Mexicali and Yuma areas is not significant to the

12   survival of today's lizards.[8] *Id*. at 36751/3. This is the historical analysis that *Defenders* and

13   this court demanded.

14        Finally, the Secretary broadened his inquiry to consider whether "[t]here were [any]

15   attributes or specific uses of the lost habitat by flat-tailed horned lizards that made it any

16   more significant than any other habitat." *Id*. at 36751/2. He determined that "there was

17   nothing of the sort." *Id*. at 36751/2. For example, although the lost habitat in and around

18   Mexicali and Yuma "is situated between the Arizona-Sonora and California-Baja California

19   Norte populations," the significance of the lost habitat as a biological corridor is minimal

20   because "the Colorado River already isolated these populations to some degree," and

21   "[m]uch of this habitat has been permanently lost due to urbanization and/or flooding of the

22   Salton Sea." *Id*. at 36751/2. Even where the desert floor has not been paved over,

23   recolonization is all but impossible because "most agricultural fields are isolated from

24

25        [8]The 2003 Rangewide Management Strategy suggests that "human activities have
26   resulted in the conversion of roughly 49% of the historic FTHL habitat to other uses, such
     as agriculture and urban development." (Supp. AR doc. # 329 at 2999); 68 Fed. Reg. at
27   348/1 (similarly concluding that "[m]uch of the species' habitat has been lost, fragmented,
28   or degraded").

1    existing flat-tailed horned lizard populations by irrigation canals." *Id*. at 36751/2. Therefore,

2    the Secretary does "not anticipate [that] any significant amount of previously lost habitat

3    could become viable habitat in the future." *Id*. at 36751/2. It is for this reason that the lost

4    habitat is not a significant portion of the lizard's historic range, despite its location at the

5    nexus of once connected but now permanently isolated habitat areas.[9]

6              **C.    Plaintiffs' Arguments for Remand**

7         Plaintiffs specifically urge the court to vacate the 2006 Finding because of its reliance

8    (both explicit and implicit) on the lizard's persistence in its current range, its refusal to

9    consider new threats to extant lizard populations, and its modification of the lizard's historic

10   range in California and in Mexico. (Doc. ## 98; 110.) These contentions are without merit.

11   Each of Plaintiffs' arguments will be addressed in turn below.

12             **1.    Lizard Persistence is a Valid Criterion**

13        Plaintiffs' first challenge to the 2006 Finding misses the mark entirely. *Defenders*

14   prohibits the Secretary from de-listing the lizard solely because it is persisting as a whole in

15   its current range, but it does not preclude the Secretary from taking the lizard's persistence

16   into account when evaluating the significance of the lost habitat. Lizard persistence cannot

17   be the only criterion of significance, but it can support a listing decision if otherwise

18   supported and explained. Indeed, the Ninth Circuit encouraged the Secretary to consider the

19   "viability of the species as a whole," when assessing the significance of lost habitat so as to

20   "allow listing of species where areas of range vital to the species' survival–but not the

21   majority of the range–face significant threats." *Defenders*, 258 F.3d at 1143, 1143 n.9.

22         In this case, the Secretary assessed the quantum of historical range now lost to species

23   and drew an inference about the significance of the lost habitat from the fact that the lizard

24   has survived for almost a century in spite of that habitat destruction. 71 Fed. Reg. at

25   36748/1. "This continued persistence over a span of nearly 100 years [and more than 25

26

27        [9]As an aside, the Secretary observed that "additional conversion of flat-tailed horned
     lizard habitat to agriculture" in the Imperial Valley and elsewhere along the Colorado River
28   is not likely because of the limited "availability of water for irrigation." *Id*. at 36751/2.

1   generations] is a strong indication that the species will continue to persist into the foreseeable

2   future despite the loss of historical habitat," the Secretary concluded. *Id*. at 36751/1.  This

3   inference marked the beginning, not the end, of the Secretary's analysis.  Lizard persistence

4   was but "one portion of a broader assessment" that "ultimately led the Service to the

5   conclusion that the lost historical habitat was not significant."  (Doc. # 114 at 14-16.)

6                              **2.    Beyond Lizard Persistence**

7           Plaintiffs contend that the "broader assessment" testified to by the Secretary is

8   unworthy of credence because it simply repackages the lizard persistence argument in

9   different terms.   Even if *Defenders* did prohibit the Secretary from taking the lizard's

10  persistence into account when evaluating the significance of the lost historical range, which

11  it does not, this argument is foreclosed by the text of the 2006 Finding itself.   After his

12  discussion of lizard persistence, the Secretary went on to assess the significance of the lost

13  historical habitat in terms of its size relative to the species' overall range (it is "relatively

14  small"), its capacity for re-colonization (the habitat is "permanently lost"), its contribution

15  to gene flow (the habitat was not a likely biological corridor even before its destruction), and

16  its impact upon the size of extant lizard populations (the lizard has not been extirpated

17  "within intact habitat through edge effects or fragmentation," and lizard populations today

18  have not significantly declined because of the habitat loss). 71 Fed. Reg. at 36751/2-3.  The

19  Secretary's qualitative and quantitative assessment of the significance of the lost habitat went

20  well beyond lizard persistence.  Thus, the rulemaking may stand because, consistent with the

21  essential holding of *Defenders*, the Secretary has explained why in his expert judgment "the

22  area in which the species can no longer live is not a 'significant portion of its range.'"  258

23  F.3d at 1145.  Plaintiffs have failed to generate a triable issue as to whether that conclusion

24  was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

25  5 U.S.C. § 706(2)(A).  The Secretary's analysis is fully consistent with *Defenders* and

26  Congress' intent when enacting the ESA: to "provide a means whereby the ecosystems upon

27  which endangered species and threatened species depend may be conserved."  16 U.S.C. §

28  1531(b).

1    The Secretary's discussion of the lizard's ability to survive habitat destruction and
2    degradation is not the fatal flaw Plaintiffs make it out to be.  In fact, it is difficult to imagine
3    how the Secretary could have complied with *Defenders* without evaluating lizard population
4    levels in the current range, which is smaller and more fragmented than the historic range.
5    For if the Secretary had found that the loss of historic range *was* significant in the sense that
6    the species is somehow threatened by its absence on its current range, then listing would be
7    required as he candidly admits.  (Doc. # 114 at 16.)  The "best scientific and commercial data
8    available" led the Secretary to this conclusion, however.  16 U.S.C. § 1533(b)(1)(A); 71 Fed.
9    Reg. at 36751/2 ("There were no attributes or specific uses of the lost habitat . . . that made
10   it any more significant than any other habitat.").  Instead, the Secretary concluded that listing
11   is not required because the species has adapted to the irrevocable curtailment of its historic
12   range and is surviving in its modern-day milieu (the 2006 Finding), and the species is not
13   likely to suffer significant habitat or population decline on its current range in the foreseeable
14   future (the 2003 Finding).  Most importantly, the Secretary explained *why* the area in which
15   the lizard can no longer live is not significant to the species, whether in terms of lizard
16   biology, desert geography, or for any other reason.  This is all that the ESA and the
17   *Defenders* decision requires from the agency entrusted with the listing decision.

18   Plaintiffs seek to undermine the Secretary's conclusion by pointing to scientific
19   evidence tending to show that the lost habitat is "a significant portion of [the lizard's] range."
20   (*See* doc. # 110 at 16-17 (discussing harmful genetic and geographic isolation of extant lizard
21   populations); Supp. AR doc. ## 232 at 1958 ("the loss of habitat . . . caused by human
22   mediated processes is significant to the species" from a genetic perspective); 329 at 3012-13
23   (flat-tailed horned lizards have "unusually large home ranges for lizards their size," and
24   studies suggest that the FTHL "may not maintain distinct home ranges, but instead shift their
25   area of use through time")).  Plaintiffs infer from these studies that the flat-tailed horned
26   lizard, like the grizzly bear, will be unable to survive in the "detached islands of population"
27   to which it has been relegated.  Aldo Leopold, *A Sand County Almanac* 198 (Oxford Univ.
28   Press 1989) (1949).  Their apprehension is not unfounded.  But the scientific evidence is far

from conclusive, and the court is not empowered by the APA to "substitute its judgment for that of the agency." *Overton Park,* 401 U.S. at 416.  Just as the documented threats to the lizard on its current range did not compel the Secretary to list the species in the 2003 Finding, so too is the Secretary privileged to form his own expert judgment about the significance of the lost habitat in 2006 Finding, provided his conclusions are reasonable and have been explained.  Here, the Secretary assessed the available scientific evidence (including the evidence of diminished gene flow) and concluded, reasonably and with ample record support, that the lost habitat is *not* a "significant portion" of the lizard's range.  The Secretary need not list the lizard solely because there are major geographical areas in which it is no longer viable but once was, *Defenders*, 258 F.3d at 1145, but he must explain why the historic acreage is not a "significant portion" of the lizard's fragmented range.  68 Fed. Reg. at 332/1 ("The distribution of the [FTHL] is not contiguous across its range, because of fragmentation by large-scale agricultural and urban development.").  The 2003 Finding failed the *Defenders* test because it simply ignored the substantive, historical dimension of the phrase, "a significant portion of its range," and assumed without explanation that large swaths of lost habitat were of no significance at all.  The 2006 Finding suffers from no such defect.

### 3. Record Support For Lizard Persistence

Plaintiffs next mount a two-prong attack upon the evidentiary sufficiency of the Secretary's conclusions regarding lizard persistence in its current range.  One prong of the attack may be readily disposed of by reference to the court's remand Order.  The second prong, which is premised upon scientific uncertainty about the population dynamics of the FTHL, misapprehends the nature of judicial review and is also without merit.

### i. Failure to Evaluate New Data

Conceding for the sake of argument that lizard persistence is a valid criterion under the *Defenders* standard, Plaintiffs impugn the record support for the Secretary's conclusions. Plaintiffs specifically fault the Secretary for failing to "evaluate new threats, re-evaluate expanding threats, and analyze new information to assess the lizard's ability to persist in its current range." (Doc. # 115 at 6.)  However, as discussed above, this court previously upheld

1    the Secretary's application of the five listing criteria to extant lizard populations both within

2    and outside of the five management areas.  (Doc. # 59 at 11-15.)  The Secretary erred in the

3    2003 Finding not in his assessment of threats to the species on its curtailed range, but "by

4    failing to evaluate the lost historical habitat and whether that lost habitat was a significant

5    portion of the range."  (Doc. # 68 at 1.)  The court authorized Plaintiffs to challenge the

6    Secretary's rulemaking by way of supplemental complaint, but only "on grounds not rejected

7    in the court's previous orders."  (Doc. # 90 at 12.)  Plaintiffs' attempt to revive their

8    challenge to the Secretary's threat assessment is contrary to court order and merits no further

9    discussion.

10         Though the court did not require it, the Secretary responded in the 2006 Finding to

11   comments relating to the construction of the Yuma Area Service Highway, the All-American

12   Canal, alternative energy proposals, increased border patrol activity, and rising incidence of

13   OHVs, among other issues.  71 Fed. Reg. at 36748-49.  This portion of the 2006 Finding

14   supplements the Secretary's original discussion of potential threats to lizard persistence with

15   updated data and reference to the 2003 Rangewide Management Strategy, but it does not

16   change the substance of his analysis.  The "[c]ommentators did not provide new information

17   or data . . . on additional threats not already considered in the January 3, 2003, withdrawal,"

18   the Secretary observed.  *Id.* at 36748/2.  Having revisited the question, the Secretary remains

19   persuaded that these factors do not pose a significant threat to the lizard in the foreseeable

20   future.  The court must defer to the Secretary's reasoned judgment.  *Northwest Ecosystem*

21   *Alliance*, 475 F.3d at 1140 (citation and internal quotations omitted). The contradictory

22   portions of the administrative record identified by Plaintiffs, such as a dissenting email from

23   a FWS biologist (Supp. AR doc. # 103), highlight ongoing differences in opinion but do not

24   undermine the legal sufficiency of the Secretary's conclusion, which finds ample support in

25   both the 2003 and the 2006 Findings.

26              **ii.      Uncertain Population Dynamics**

27         Plaintiffs seize upon the scientific uncertainty surrounding the population dynamics

28   of the FTHL in an effort to undermine the Secretary's conclusions regarding the viability of

1    the lizard in the near and long term.  (Doc. # 115 at 5.)  This argument misapprehends the

2    nature of judicial review of agency action under the Endangered Species Act.  The ESA

3    mandates that the listing decision be made "solely on the basis of the best available scientific

4    and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  This "best available science"

5    standard requires "far less than conclusive evidence" or "absolute scientific certainty."

6    *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C. 1997).  Rather, the standard

7    requires the agency to consider the scientific information presently available.  *Id.*  Deference

8    to an agency's scientific and technical expertise dictates that agency action must be upheld

9    as long as the agency has "considered the relevant factors and articulated a rational

10   connection between the facts found and the choice made."  *Baltimore Gas & Elec.*, 462 U.S.

11   at 105.

12          In this case, a flat-tailed horned lizard Population Viability Analysis ("PVA") was

13   conducted in 1998.  The results of the study were inconclusive.  The PVA "provided no

14   estimate of the minimum viable population size and did not determine whether populations

15   contained in the [management areas] were viable."  68 Fed. Reg. at 334/3.  In fact, the

16   conservation team noted that the "greatest value of this exercise is to  illuminate the paucity

17   of population data for this species."  (Supp. AR doc. # 28 at 577.)   Though the scientists

18   expressed "[u]ncertainty in the interpretation of the PVA results," the study nevertheless

19   provided "some insight into the mechanisms of FTHL population dynamics." (*Id.*; Supp. AR

20   doc. # 329 at 3013.)  For example, the PVA "illustrated the sensitivity of flat-tailed horned

21   lizards  population  viability  to  certain  factors,  particularly  changes  in  mortality  and

22   fecundity."  68 Fed. Reg. at 334/3.  On the basis of these preliminary insights, the authors of

23   the Rangewide Management Strategy opined that each of the management areas contains

24   viable FTHL Populations.  (Supp. AR doc. # 329 at 3013.)

25          In the 2006 Finding, the Secretary evaluated the inconclusive results of the PVA in

26   light of "recent estimates of [FTHL] population sizes" conducted both within and outside of

27   the five  management areas. 71 Fed. Reg. at 36751/2-3.  He concluded on the basis of these

28   estimates that "the species remains viable throughout most of its current extant range" in

1    California, Arizona, and Mexico.  *Id*. at 36751/3. The Secretary explained his finding as

2    follows,

> [T]he available data concerning population abundance, trends, and threats do not
> suggest, outside the Coachella Valley, that flat-tailed horned lizard populations are
> declining in any of the geographic areas, or that because of [] habitat loss and
> degradation the species is likely to become endangered within the foreseeable future
> . . . .  Recent estimates of population sizes . . . [show] no large decline in population
> size occurred between 2003 and 2005 in areas for which we have more than one year
> of data.

7    71 Fed. Reg. at 36751/2-3.

8        Plaintiffs do not suggest that more conclusive scientific data on FTHL population

9    dynamics are presently available.  Rather, they direct the court's attention to the dissenting

10   opinions of peer reviewers, 68 Fed. Reg. at 340-41, and lizard experts such as Dr. Wendy

11   Hodges, a Plaintiff in this action, who believes that "the loss of habitat . . . caused by human

12   mediated processes is significant to the species" from a genetic perspective.  (Supp. AR doc.

13   # 232 at 1958.)  That some experts have concluded that the lizard is *not* viable in its current

14   range because of the habitat loss does not preclude the Secretary from finding that lizard *is*

15   viable, provided he presents a "rational connection between the facts found and the

16   conclusions made."  *Nat'l Wildlife Fed'n*, 384 F.3d at 1170; *Marsh v. Oregon Natural*

17   *Resources Council,* 490 U.S. 360, 378 (U.S. 1989) ("When specialists express conflicting

18   views, an agency must have discretion to rely on the reasonable opinions of its own qualified

19   experts even if, as an original matter, a court might find contrary views more persuasive.").

20   The ESA does not require conclusive evidence of minimum viable population size.

21   Unanimous scientific consensus is not a prerequisite to lawful rulemaking.  Though some

22   may disagree with his conclusions, the Secretary's assessment of inconclusive data relating

23   to the lizard's viability on its current range is supported by the "best available science" and

24   has been adequately explained on this record.

25                **4.  Exclusion of California Habitat and Inclusion of Mexican Habitat**

26       Finally, Plaintiffs challenge the Secretary's decision to modify the species' historic

27   range by excluding approximately 1,309,409 acres in the vicinity of California's Salton Sea,

28   and adding two blocks of uncertain acreage in Mexico.  71 Fed. Reg. at 36745/3; 36749/3-

1   36750/1.  Plaintiffs charge the Secretary with "arbitrarily" changing "direction in the midst

2   of the administrative process," decreasing "the percentage of lost historical habitat," and

3   "creating the appearance that lost habitat is insignificant" thereby.  (Doc. # 115 at 8.)  The

4   2006 Finding marks the first time that the Secretary has defined the species' historic range

5   in this particular manner.  But a change of direction is not fatal to a rulemaking where, as

6   here, the modifications are reasonable and have been explained.

7           The Secretary has discretion to delimit the historic range of the FTHL in accordance

8   with his expert judgment and the "best available science" standard.  *Defenders*, 258 F.3d at

9   1145.   The court must determine whether the Secretary's delineation is "based on a

10  consideration of the relevant factors and whether there has been a clear error of judgment."

11  *Overton Park*, 401 U.S. at 416.  Where the agency reverses course, it "will be required to

12  show not only that its new policy is reasonable, but also to provide a reasonable rationale

13  supporting its departure from prior practice." *Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335,

14  1345 (9th Cir. 1990) (citing *Motor Vehicle Mfrs.,* 463 U.S. at 29).   "[I]f the agency

15  adequately explains the reasons for a reversal of policy, change is not invalidating, since the

16  whole point of *Chevron* is to leave the discretion provided by ambiguities of a statute with

17  the implementing agency."  *Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 980 (citation and

18  internal quotations omitted).   "Unexplained inconsistency is . . . reason for holding an

19  interpretation to be an arbitrary and capricious change from agency practice under the

20  Administrative Procedure Act," but a reasoned departure from prior practice in response to

21  evolving scientific consensus or changed factual circumstances is not. *Id*. ("An initial agency

22  determination is not instantly carved in stone.  On the contrary, the agency . . . must consider

23  varying interpretations and the wisdom of its policy on a continuing basis.") (citations and

24  internal quotations omitted).  Therefore, neither the ESA nor the APA prohibits the Secretary

25  from "changing direction in the midst of the administrative process," as Plaintiffs mistakenly

26  contend.  It would be strange indeed to fault the Secretary for refining his estimation of the

27  lizard's historic range when this is precisely what the court required of him on remand.

28

1

2

### i.   The Exclusion of the Salton Basin

### a.   Not Historical Habitat

3      The Secretary has determined that 1,309,409 acres of previously included habitat

4  within and surrounding the Salton Sea (the "Salton Basin") was not historical habitat at all.

5  71 Fed. Reg. at 36749/3-50/1.  The available historical information indicates that the Salton

6  Basin has been flooded by water from the Colorado River on at least 15 occasions since 700

7  AD. *Id.* at 36745/3-46/1; 36750/1.  The water overflowed into the Salton Basin area to form

8  historic Lake Cahuilla.  *Id.* at 36750/1.  "Flat-tailed horned lizards were likely killed during

9  floods as water rushed into the basin and recolonization occurred as the water evaporated."

10  *Id.* at 36750/1.  The Secretary goes on to observe, "Even when the lake was dry, a large

11  portion of the dry lakebed was likely unsuitable habitat for flat-tailed horned lizards."  *Id.* at

12  36750/1.  "Much of the area within the former Lake Cahuilla lakebed was not only

13  intermittent, but low-quality habitat for the . . . lizard, particularly the central salt deposits

14  and saltier, less sandy portions of the *Atriplex* community."  *Id.* at 36750/3.  The Secretary

15  excluded the Salton Basin acreage because it provided only intermittent, low-quality habitat

16  for the species.  *Id.* at 36750/1.  The change of course, which was foreshadowed to some

17  extent by the Secretary's discussion in the 2003 Finding about the "ephemeral" nature of this

18  habitat, is reasonable and has been adequately explained.  68 Fed. Reg. at 332/2.

19                          ### b.   The Habitat Was Not Significant

20      Even if the Salton Basin were considered historical habitat, the Secretary avers that

21  the region would still be excluded from the lizard's range because of its limited ability to

22  support viable FTHL populations.  Scientists have found it difficult to study historic Lake

23  Cahuilla. They have struggled to define, for example, "the precise proportion of the lakebed

24  that historically was habitat, and the quality of that habitat," due to unknowns such as the

25  precise proportions of specific plant communities in the Salton Basin and the patterns of

26  windblown sand deposition. 71 Fed. Reg. at 36750/3.  "Despite the difficulty in accurately

27  determining historic conditions in the dry lakebed," the Secretary found "that it contained

28  only a limited amount of suitable habitat, most of which is likely to have been marginal at

1    best. "*Id*.  What is more, the Secretary observed that "recent work on the genetics of the flat-

2    tailed horned lizard suggests that gene flow across the lakebed between the east and west

3    sides of the Salton [Basin] was low even before the current fragmentation due to

4    development and agriculture." *Id*.  The lack of "substantial gene flow across the Imperial

5    Valley since the drying of Lake Cahuilla . . . and prior to human development" tends to

6    support the Secretary's conclusions about the significance of this area. *Id*.  "Thus," the

7    Secretary reasonably concluded, "even if the lakebed were considered historical habitat, it

8    would not be significant to the species." *Id*.  The Secretary's decision to include low-quality

9    habitat of a different character in areas such as the Yuha Basin, Ocotillo Wells, or Borrego

10   Badlands, does not preclude him from excluding the marginal acreage at issue here.  (Doc.

11   # 115 at 12-13.)  Congress vested the Secretary with authority to make such scientific

12   judgments.  The Secretary's conclusions will not be disturbed if, after searching inquiry, the

13   court finds the policy reversal to be reasonable and adequately explained.  Having reviewed

14   all portions of the original and supplemental record identified by Plaintiffs, the court finds

15   that the Secretary's exclusion of the Salton Basin as providing only "intermittent, low-quality

16   [lizard] habitat" was not arbitrary or capricious or otherwise in violation of the ESA or the

17   APA.  71 Fed. Reg. at 36750/1.

18                                    **ii.    Addition of Mexican Habitat**

19           In the 2003 Finding, the Secretary described the lizard's Mexican habitat as extending

20   "from the international border in the Yuha Desert in California, south to the Laguna Salada

21   in Baja California, and from the international border in the Yuma Desert in Arizona, south

22   and east through the Pinacate Region to the sandy plains around Puerto Peñasco and Bahia

23   de San Jorge."  68 Fed. Reg. at 332/1.  The 2006 Finding contains a substantially identical

24   description of the Mexican habitat, except that the Secretary changed his description of the

25   range south of the Yuha Desert by extending the species' habitat "along the west side of

26   Laguna Salada" in Baja California.  71 Fed. Reg. at 36745/3.  The precise number of acres

27   appended to the species' Mexican range is not disclosed on the face of the 2006 Finding.

28

Rather than explaining the change in policy directly, as he did with the Salton Basin, the Secretary justified the change to the Mexican habitat by way of a citation to the Rangewide Management Strategy. *Id*. at 36746/2, 36749/3. The Secretary relied upon the 2003 RMS because it "contain[s] updated information on the current and historical range of the species in the United States and Mexico . . . in geographical information system (GIS) format," and represents the "most recent analysis of the species' range in the United States and Mexico." *Id*. at 36746/1-2; (*see* Supp. AR doc. # 329 at 3008 (depicting the lizard's current and historical Mexican range); 3006 (describing the Mexican range)). An early draft of the 2006 Finding explains that "approximately 50 miles" of new acreage "south of the northern lobe of Laguna Salada," along with "approximately 10 - 20 miles" of new range "south and east along the coast of the Gulf of California past Puerto Peñasco," were added to the lizard's range because of a sighting of the species in each area, and because of the presence of suitable habitat."[10] (Supp. AR doc. # 126 at 1141.) This language does not appear in the final version of the 2006 Finding, however.

While the Secretary explained his reliance upon the 2003 Rangewide Management Strategy to support his delineation of the species' Mexican range in general, 71 Fed. Reg. at 36749/3, he did not explain why, or by how much, he extended the Laguna Salada range in the 2006 Finding, and he did not disclose the addition of new habitat along the Gulf of

---

[10]Plaintiffs oppose this conclusion by observing that the "leading Mexican study" from 2002 "concludes there is a [probable] absence of lizard in the Gran Desierto,"and also "reject[s]" the idea that the lizard's distribution extends south of the Laguna Salada. (Doc. # 115 at 9) (citing Supp. AR doc. # 297 at 2603).) However, the conflicting assessment offered by the Mexican study is of little moment where, as here, the Secretary has adequately explained his decision to credit the "updated information" contained in the 2003 Rangewide Management Strategy instead. A consistent theme in the Secretary's rulemakings is that "the distribution of the species in Mexico is poorly understood because few surveys have been conducted" there. 68 Fed. Reg. at 332/2. That the scientific community's understanding of the lizard's historic and current range in Mexico "could benefit from further surveys and/or modeling," does not preclude the Secretary from drawing reasonable inferences from the best available data, in this case the 2003 Rangewide Management Survey. (Supp. AR doc. # 329 at 3007.)

1    California at all.  Instead, the court was required to comb through the administrative record,

2    including prior versions of the 2006 Finding and email correspondence between FWS

3    biologists, to understand the extent of the new acreage and the specific reasons for its

4    inclusion.  (Doc. ## 110 at 18-20; 115 at 9-10.)  The court cannot "be compelled to guess at

5    the theory underlying the agency's action; nor can a court be expected to chisel that which

6    must be precise from what the agency has left vague and indecisive."  *SEC v. Chenery Corp.*,

7    332 U.S. 194, 196-97 (1947).  The Secretary's failure to explain the changes to the Mexican

8    habitat on the face of the 2006 Finding prevents the court from upholding that portion of his

9    rulemaking.  The court "cannot supply a reasoned basis to make up for deficiencies in the

10   agency's decision," nor can it "defer to the FWS when its path of reasoning is not clear."

11   *Nat'l Ass'n of Home Builders*, 340 F.3d at 849.

12        However, the Secretary's failure to explain the addition of new Mexican habitat is not

13   material to the 2006 Finding because the Secretary's overall assessment of the size of the

14   Mexican range relative to that north of the international border did not change when the new

15   territory was included.  In the 2003 Finding, which does not include the new acreage in the

16   vicinity of the Laguna Salada and the Gulf of California, the Secretary found that

17   "approximately 59 percent of the species['] range occur[s] in Mexico.  68 Fed. Reg. at 332/2.

18   The 2007 Finding, which includes that range by reference to the 2003 RMS, contains the

19   same assessment.  71 Fed. Reg. at 36746/1.  The expansion of the Mexican range in the 2007

20   Finding was not substantial enough to cause the Secretary to alter his estimation of the

21   relative size of the Mexican habitat.[11]  What is more, the challenged acreage south of the

22   _____

23        [11]Plaintiffs observe (apparently for the first time) that the Secretary in two prior

24   rulemakings contradictorily averred, "About 29 percent of the lizard's historic range is in
     Mexico."  58 Fed. Reg. at 62624 (1993 proposed rule); 62 Fed. Reg. at 37853/1 (same in

25   1997 withdrawal with citation to Johnson and Spicer (1985)).  The inconsistency between
     this figure and the 59 percent figure referenced in the 2003 and 2006 withdrawal notices is

26   explained on the record, though not in the rulemakings themselves.  FWS biologist Jim
     Rorabaugh explained that the 29 percent figure can be attributed to out-dated reports and

27   speculation, while the 59 percent figure is more solidly grounded on empirical analysis and

28   the Rangewide Management Survey.  (Supp. AR doc. # 125 at 1133.)

international border played no discernible role in the Secretary's assessment of the significance of the Mexican range or of the lost historical range as a whole. *Id*. at 36750-51. Therefore, the unexplained inclusion of the new Laguna Salada and Gulf of California territory, though to be disregarded, does not warrant remand.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (doc. # 109) is denied and Defendants' Cross-Motion for Summary Judgment (doc. # 113) is granted.

IT IS FURTHER ORDERED, based on this Order and the Order of August 30, 2005 (doc. # 59), that the Clerk enter judgment in favor of Defendants and that Plaintiffs take nothing.  The Clerk shall terminate this action.

DATED this 12th day of July, 2007.

_____
Neil V. Wake
United States District Judge